IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SAMIR COYETT : CIVIL ACTION
:
v. :
:
CITY OF PHILADELPHIA, et al. : NO. 15-869

MEMORANDUM

Dalzell, J. December 10, 2015

## I. Introduction

We consider here the City of Philadelphia's partial motion for summary judgment concerning plaintiff's Monell claim.

Samir Coyett brings this action against all defendants pursuant to 42 U.S.C. § 1983 and claims that his civil rights were violated when officers from the Philadelphia Police Department ("PPD") allegedly used excessive force during an arrest in 2013. Coyett specifically asserts that the City failed to properly train its police officers on the use of force, and that this failure to train amounted to deliberate indifference to his rights. He further avers that the City maintained a policy or custom of failing to discipline police officers who used excessive force. Further, Coyett asserts that the City's actions were the cause of the alleged violation of his civil rights. The City has moved for summary judgment on Coyett's Monell claim, arguing that he has not presented evidence that would allow a reasonable jury to impose municipal liability in this matter.[1]

---

[1] We cannot help but comment on the civility, or lack thereof, on display by the attorneys in this case. A combination of snide remarks, malevolent accusations, and threatening statements scarcely constitute a model form of communication between counsel, as evidenced by terse emails, hostile discussions during depositions, and a discovery dispute where we resolved a motion to compel and found each attorney to be partly at fault. Nowhere is this animosity better

We have jurisdiction over these claims pursuant to 28 U.S.C. § 1331.  For the reasons set forth below, we will deny the City's motion for summary judgment on Coyett's Monell claim.

## II.   Factual and Procedural History

This matter arises out of an incident that occurred on July 21, 2013.  Philadelphia Police Officers Vincent Perone, Damon Linder, Jorge Soto, and Duane White were on-duty, uniformed officers in the 19th District.  Mot. at ¶ 1.  At around 5:32 p.m., the officers responded to a radio call claiming that two men with guns were arguing near 5300 Hazelhurst Street.  Mot at ¶ 2 and Pl.'s Resp. in Opp'n at ¶ 2.   The caller had described the two individuals as African-American males wearing black t-shirts and brown hats.  Mot. at ¶ 3.  Officers Soto and White arrived first at the scene where they observed then seventeen-year old Samir Coyett, who they contend matched the description of the men the caller described.[2]  Id. at ¶ 4.  Officer Soto exited the police vehicle and approached Coyett, who looked at Officer Soto and then fled on foot.  Id. at ¶ 5.  Officer Soto stated that he could not see Coyett's hands as he was fleeing and that "[Coyett's] hands were around his waist the whole time."  Soto Dep. at 24: 16-17, 2-6.  As Coyett ran, he discarded packets of marijuana that Officer Soto later recovered.  Mot. at ¶¶ 7-8.

---

illustrated than in the dispute that occurred towards the end of Lieutenant Prendergast's deposition.  See Prendergast Dep. at 50-57.  The record of this deposition reads like a legal satire of Abbott and Costello's classic comedy routine "Who's on First?" but is decidedly less funny.  The low point of the exchange occurred when it devolved into something that one would expect to overhear in a fourth-grade classroom, with both attorneys demanding the other cite a relevant Rule of Civil Procedure for his position while talking over each other.  Id. at 56: 9-19.

We do not intend to discount the seriousness of the underlying matter with our observations, and counsel are commended for their attempts to zealously advocate for their clients.  But zealous representation does not foreclose the possibility of cordial discourse, something that has been notably lacking during this action.  We expect all attorneys before us always to act in a dignified and professional manner.

[2] Plaintiff contends that the only thing that fit the caller's description was his skin color.  See Pl.'s Resp. in Opp'n at ¶ 4.  But Coyett was wearing a black shirt, so this contention is unwarranted.

2

Officer White pursued Coyett and observed plaintiff "gripping his waistband with his left hand." White Dep. at 39: 15-16. Officer White stated that, while he did not see Coyett with a gun, he "notified [his] backup officers to use caution; the male might possibly be armed." Id. at 40: 22-24. He elaborated in his deposition by saying that, "I was confident that [Coyett] might possibly be armed. We was [sic] there for a person with a gun, so I notified them that he might be armed with a gun." Id. at 41: 1-3.

Officers Linder and Perone were the backup officers who arrived on the scene. Both officers stopped at the north end of Turner Street and entered the east alley there in search of Coyett. Mot. at ¶ 11. Officer Perone discovered Coyett sitting on the ground in the backyard of a home. Id. at ¶ 14, Perone Dep. at 33: 8-10. He ordered Coyett several times to put his hands up, with Coyett stating that Perone kept repeating, "Put your hands up," and "Put your fucking hands up." Coyett Dep. at 49: 19-23. Officer Perone then fired one round from his service revolver and the bullet struck Coyett in his right forearm. Mot. at ¶ 14. Whereupon Coyett asked Officer Perone, "[W]hy did you shoot me?". Perone Statement for Internal Affairs Investigation at page 5. Coyett was unarmed. Pl.'s Resp. in Opp'n at 4. Medical personnel took Coyett to a local hospital for treatment, Coyett Dep. at 54: 16-24, and Coyett was arrested and charged with "possession of a small amount of marijuana" to which he later pled guilty. See Coyett Juvenile Docket at 2.

Officer Perone stated that he shot Coyett because Perone "[f]ear[ed] for [his] safety," Perone Statement at 4, and further noted that he had no remorse for the shooting because "Coyett put himself in that situation by not following directions and running from the police."[3] Perone

---

[3] We do not condone Coyett's actions in this incident. It is undisputed that he fled police, was arrested, and later pled guilty to charges of marijuana possession. But the irresponsible and

Dep. at 45: 12-18.  Notably as to this case, Perone said that he had received use of force training while attending the Police Academy in 2009, but he did not remember any specific tests on the subject.  Id. at 7: 3-6.

Following this incident, the PPD's Internal Affairs Unit conducted an investigation as required by Directive No. 10, which outlines the Department's policies regarding use of force. Mot. at ¶ 15.  Lieutenant John Prendergast was the lead investigator on the case and, after interviewing the officers involved in the shooting, wrote a report recommending that the Use of Force Review Board ("UFRB") "review the totality of the circumstances and issue a decision regarding the Philadelphia Police Department's policy, Directive #10, pertaining to the use of deadly force."  Prendergast Mem. to Police Commissioner at 6.  The UFRB, consisting of four deputy commissioners, found that Officer Perone did not discharge his firearm according to departmental policy, and recommended he attend situation-based training and be referred to the Charging Unit.  See UFRB Mem. to Police Commissioner at 1.  The Charging Unit charged Perone with "[d]ischarging, using, displaying or improper handling of a firearm while not in accordance to Departmental Policy," specifically stating that Perone had "violated Directive 10 in that [he] utilized poor tactics during [his] discharge as this should have been treated as a barricade situation."  Charging Unit Statement at 1.  Perone pled not guilty to the charges and requested a hearing before the Police Board of Inquiry ("PBI").  Id.

Perone's PBI hearing occurred at 9:00 a. m. on January 29, 2015.  Present at the hearing were Police Department Advocate Lieutenant Kenneth Michvech and Fraternal Order of Police lawyer Timothy Strange.  PBI Report at ¶ 2.  The PBI board consisted of three PPD officers.  Id. at ¶ 3.  The hearing lasted about thirty minutes, and Michvech and Strange both spoke, along

---

foolish actions of a seventeen-year-old do not justify a police officer shooting him when he is unarmed and on the ground in a back alley.

with Prendergast, who was the only person called to testify during the hearing.  Perone Dep. at 15: 20-22.  Perone spoke at this hearing only when he was sworn in by the PBI.  Perone Dep. at 15: 15-18.  The only evidence Michvech presented during his prosecution were the shooting package prepared by Prendergast and Prendergast's testimony where he simply read his report to the UFRB.  Michvech Dep. at 33: 2-5, 35: 3-8.  The PBI was thus presented with same evidence seen by the UFRB when it found that Perone had violated Directive 10.  Id. at 37: 1-14.  Perplexingly, the PBI report stated that plaintiff Coyett "failed to appear" at this hearing, when in reality no one had informed Coyett of it nor asked him to attend.  See PBI Report at ¶ 9; see also Michvech Dep. at 31: 15-24, 32: 1-2.[4]  The PBI arrived at its decision several minutes after the hearing's conclusion and unanimously found Perone not guilty of Discharging, Using, Displaying or Improper Handling of a Firearm.  See PBI Report at 2; see also Perone Dep. at 20: 11-20.

In March of 2015, the United States Department of Justice issued a technical report ("DOJ Report") on the "current and future states of deadly force policy, training, investigations, and practice in the Philadelphia Police Department."[5]  DOJ Report at 1.  The report contained several findings relevant to this matter.  First, it stated that fifty-nine unarmed suspects were shot

---

[4] This report also stated that Michvech provided an "aggressive prosecution," PBI Report at ¶ 2, though it is unclear to us how one report and one witness presented during a thirty minute hearing can be considered an "aggressive prosecution."

[5] The DOJ compiled this report after Commissioner Charles Ramsey, who should be commended for his efforts to improve the PPD's use of force policies and practices, requested technical assistance through the Collaborative Reform Initiative.  While neither party briefed us on the appropriateness of using the DOJ report as evidence for the purposes of this summary judgment motion, we feel obliged to comment on the topic.  It is proper to use this report as evidence when deciding this summary judgment motion, as it is a public record pursuant to Fed. R. Evid. 803(8)(a)(iii).  Further, the use of the report as evidence is precluded neither by Fed. R. Evid. 407 or public policy.  The report is not a "subsequent remedial measure" as articulated in Rule 407.

by police officers between 2007 and 2013.  Id. at 27.  Over fifteen percent of the individuals shot by police officers during this time period were unarmed.  Id.

Second, the report found the PPD's training techniques regarding the use of force to be lacking.  The report found that police recruits do not receive substantive de-escalation training.  Id. at 69-70.  It stated that PPD training scenarios are not developed with a consistent method or evaluation process, that there was a desire among officers for more reality-based training, and that the majority of academy instruction and scenario-based training sessions related to the use of force ended with the officer <u>having to use force</u>.  Id. at 70-75 (emphasis added).  Further, it found that officers do not receive in-service training on threat perception, decision-making, and de-escalation techniques.  Id. at 76-81.  The report concluded that the PPD needed to incorporate training scenarios "that allow [officers] to hone their threat perception skills and better identify behavior such as 'waistband-tugging' where no weapons are present."  Id. at 84.  Perhaps most troubling, the report found that PPD officers do not receive regular or consistent training on the Department's deadly force policy.  Id. at 40.  In fact, the report found that officers did not know the appropriate standard for using deadly force in accordance with PPD policy:

> Officers we interviewed throughout the department believed that being in fear for their life was sufficient justification to use deadly force while mostly neglecting the objectively reasonable standard set forth in PPD policy and Graham v. Connor.  The dictum 'in fear for my life' was the most common theme throughout all of our conversations with PPD officers and sergeants regarding deadly force policy.  Yet, notably, the word 'fear' does not appear in PPD directive 10 nor is it supported by current case law.

Id.

Finally, the report criticized the internal review process for officer-involved shootings, particularly the conduct of the PBI.  The report examined the cases where the UFRB had found that an officer's use of force violated PPD policy and then sent the case to the PBI for a formal

6

disciplinary hearing. Id. at 109-110. After reviewing a total of eighty-eight PBI cases, the report found that the "UFRB's findings were essentially invalidated nearly half of the time." Id. at 111. The report's recommendation on this topic succinctly explained the problem caused by this internal review system: "The UFRB and PBI are duplicative processes that at times have conflicting outcomes. This sends a mixed message to members of the department and causes unnecessary internal strife." Id. at 112. The report's sub-recommendations on this issue included dismantling the two-board system and combining the functions of the UFRB and PBI into one integrated board, mandating said board to conduct a comprehensive review of each incident, and expanding the board's power to call witnesses and ask questions about such incident. Id. at 113. In conclusion, while noting that the PPD is a large, complex organization, the report "uncovered policy, training, and operational deficiencies in addition to an undercurrent of significant strife between the community and department." Id. at 9.

### III.    Legal Standard

Parties may move for summary judgment on any claim or defense in the case, and the "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A party moving for summary judgment bears the initial burden of informing the district court of the basis for its argument that there is no genuine issue of material fact by "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotations omitted). If the moving party meets this initial burden, Fed. R. Civ. P. 56 then obliges the non-

moving party to show, via submissions beyond the pleadings, that there are genuine factual issues for trial. Id. at 324.

There is a genuine issue of material fact only when there is sufficient evidence such that a reasonable jury could find for the party opposing the motion. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986) (explaining further that a mere scintilla of evidence is insufficient). Material facts are those that would affect the outcome of the case under the governing law. Id. at 248. We may not make credibility determinations or weigh the evidence, and we must draw all reasonable inferences in favor of the non-moving party. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150 (2000); Amour v. County of Beaver, PA, 271 F.3d 417, 420 (3d Cir. 2001). Even if the facts are undisputed, a disagreement over what inferences may be drawn from the facts precludes a grant of summary judgment. Ideal Dairy Farms, Inc. v. John Labatt, Ltd., 90 F.3d 737, 744 (3d Cir.1996). Our function is to determine whether there is a genuine issue for trial, and we may not prevent a case from reaching a jury simply because we favor one of several reasonable views of the evidence. Abraham v. Raso, 183 F.3d 279, 287 (3d Cir. 1999).

**IV.    Discussion**

The City of Philadelphia moves for summary judgment on Coyett's Monell claims, and we will deny the City's motion. Based on the evidence of record, a reasonable jury could find that the City failed to train its police officers on the use of force and acquiesced in a custom of tolerating the use of excessive force by maintaining an ineffective disciplinary system for its officers. Such a jury could further find that these customs were the "moving force" behind Perone's shooting of an unarmed Coyett.

A.      *Monell* Standard

Section 1983 creates a cause of action against any person who, acting under the color of state law, abridges certain Constitutional rights and the laws of the United States. 42 U.S.C. § 1983. Municipalities and other units of local government are "included among those persons to whom § 1983 applies." Monell v. Dep't of Soc. Servs. of City of N.Y., 436 U.S. 658, 690 (1978). A municipality is liable for its employees' violations of Section 1983 only where the "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Id. at 694.

A plaintiff can demonstrate the existence of a governmental policy by showing "that a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issued an official statement of policy." Jiminez v. All American Rathskeller, Inc., 503 F.3d 247, 250 (3d Cir. 2007) (quoting Pembaur v. City of Cincinnati, 475 U.S. 469, 481 (1986)) (internal alterations omitted). To show a custom, a plaintiff must establish that state officials engaged in a course of conduct so permanent and well-settled that it operated as law. Id. (citing Monell, 436 U.S. at 690).

In either case, a plaintiff must show a government policymaker's responsibility for, or acquiescence in, the alleged tort. Id. (citing Andrews v. City of Phila., 895 F.2d 1496, 1480 (3d Cir. 1990)). The plaintiff need not specifically identify the responsible decisionmaker, since practices that are considered custom or policy under Monell are ascribed to municipal decisionmakers. Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990). Thus, even if a custom or policy "has not been formally approved by an appropriate decisionmaker," it "may fairly subject a municipality to liability on the theory that the relevant practice is so widespread as to have the force of law." Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 404 (1997).

To be liable under Section 1983, "the government must act with deliberate indifference to the purported constitutional deprivation." Jiminez, 503 F.3d at 250. As a result, a failure to train may constitute a policy or custom giving rise to Section 1983 liability for a municipality only if the failure demonstrates deliberate indifference to residents' constitutional rights. See City of Canton v. Harris, 489 U.S. 378, 389 (1989). A failure to train evinces deliberate indifference if:

> in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.

Id. at 390. Moreover, a district court should impose liability only when "the training should have been more thorough or comprehensive," not "merely because municipal training could have been more thorough or comprehensive." Berrios v. City of Phila., 96 F.Supp.3d 523, 536 (E.D. Pa. 2015) (Jones, J.) (internal citations omitted) (emphasis in original). The Supreme Court has also noted that a pattern of similar constitutional violations by untrained municipal employees is ordinarily necessary to demonstrate deliberate indifference in cases alleging a failure to train. Connick v. Thompson, 563 U.S. 51, 62 (2011). In particular, the Supreme Court has explicitly stated that a lack of instruction in the use of firearms or in the use of deadly force could constitute deliberate indifference under a failure to train theory. City of Canton, 489 U.S. at 390.

Our Court of Appeals has adopted a three-part test for determining whether a municipality's failure to train or supervise amounts to deliberate indifference, stating that a plaintiff must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Carter v. City of Phila., 181 F.3d 339, 357 (3d Cir. 1999).

Moreover, our Court of Appeals has held that a municipality can be found liable under Monell when it "knew about and acquiesced in a custom tolerating the tacit use of excessive force by its police officers." Beck v. City of Pittsburgh, 89 F.3d 966, 976 (3d Cir. 1996). Most relevant to this matter, our colleague Judge Padova has held that a reasonable jury could find that the City of Philadelphia "was deliberately indifferent to the systemic deficiencies in the internal investigatory and disciplinary mechanism of the PPD and to the risk that these deficiencies would result in violations of citizens' rights." Lyons v. City of Phila., No. 06-5195, 2007 WL 3018945, at *8 (E.D. Pa. Oct. 12, 2007).

Finally, to sustain a Monell claim, a plaintiff must show "a 'direct causal link between a municipal policy or custom and the alleged constitutional deprivation' to ground municipal liability." Jiminez, 503 F.3d at 249 (quoting City of Canton, 489 U.S. at 385). Put another way, the municipality's "decisions must be the 'moving force' behind an actual constitutional violation." Grazier ex rel. White v. City of Phila., 328 F.3d 120, 125 (3d Cir. 2003) (quoting City of Canton, 489 U.S. at 389). The question of causation should be left to a jury "as long as the causal link is not too tenuous." Bielevicz, 915 F.2d at 851. And our Court of Appeals has been even more explicit on this causation question in regards to police misconduct:

> [T]o sustain a § 1983 action against the City, plaintiffs must simply establish a municipal custom coupled with causation – i.e., that policymakers were aware of similar unlawful conduct in the past, but failed to take precautions against future violations, and that this failure, at least in part, led to their injury. If the City is shown to have tolerated known misconduct by police officers, the issue whether the City's inaction contributed to the individual officers' decision to arrest the plaintiffs unlawfully in [a given] instance is a question of fact for the jury.

Id.  Thus, district courts should not be so quick to toss Monell claims on summary judgment, even if it seems that a plaintiff will struggle to show causation between the municipal custom and the injury caused by an individual officer.

### B. Analysis

After a careful and extensive examination of the record, we find that a reasonable jury could determine that the City of Philadelphia can be held liable under the theory that it failed to train its officers.  The test for imposing liability on a municipality under Section 1983 laid out by the Supreme Court in Monell and its progeny, while stringent, should not and cannot be interpreted as impossible to meet.

The facts in this case show that Perone shot an unarmed teenager because he was afraid for his safety, mistakenly believing that this was the correct standard for determining when it is appropriate to use deadly force.  See Perone Statement at 4.  The DOJ report documents that many officers share this mistaken belief.  DOJ Report at 40.  When many in a police force perform their duties under the mistaken belief that fear for one's own safety is justified for the use of deadly force against a citizen, it is safe to say that a reasonable jury could find that this practice, "though not authorized by law…is so permanent and well-settled as to virtually constitute law."  Andrews, 895 F.2d at 1480 (internal citations omitted).

A reasonable jury could further find that there is a custom of failing to properly train officers on the use of deadly force.  Perone stated that while he did receive use of force training at the Police Academy, he did not remember being tested on the subject.  Perone Dep. at 7: 3-6.  There is also no evidence that Perone received any further use of force training between the time he left the Police Academy and the date when he shot Coyett.   This matches the deficiencies in the use of force training detailed in the DOJ Report.  To recap, that report found that police

recruits do not receive substantive de-escalation training. DOJ Report at 69-70. It found that PPD training scenarios are not developed with a consistent method or evaluation process, that there was a desire among officers for more reality-based training, and that the majority of academy instruction and scenario-based training sessions related to the use of force end with the officer <u>having to use force</u>. <u>Id.</u> at 70-75 (emphasis added).[6] The report also noted that officers do not receive in-service training on threat perception, decision-making, and de-escalation techniques. <u>Id.</u> at 76-81. Finally, it found that PPD officers do not receive regular or consistent training on the Department's use of deadly force policy. <u>Id.</u> at 40. This evidence is sufficient that a reasonable jury could find that the City has a custom of failing to train its police officers on the use of deadly force.

There is also ample evidence for a reasonable jury to find a pattern of similar constitutional violations by untrained municipal employees that shows a deliberate indifference on the part of the City for its failure to improve its use of force training, especially its training on the use of deadly force. <u>See</u> <u>Connick</u>, 563 U.S. at 62; <u>see also</u> <u>City of Canton</u>, 489 U.S. at 390. Perone's shooting of an unarmed citizen was not a one-time occurrence for the PPD. In fact, between 2007 and 2013, fifty-nine unarmed suspects were shot by PPD officers in Philadelphia. DOJ Report at 27. In statistical terms, over fifteen percent of those shot at PPD officers' hands during this time were unarmed. <u>Id.</u> This evidence suffices to establish a pattern of constitutional violations.

Additionally, the evidence of record could lead a reasonable jury to find that Coyett has satisfied the three-part test for deliberate indifference articulated by our Court of Appeals. As

---

[6] We should note that the City also failed to provide training regarding situations, such as here, where a suspect is tugging at his waistband. <u>See</u> DOJ Report at 84; <u>see also</u> White Dep. at 39: 15-16.

stated, to determine whether a municipality's failure to train or supervise amounts to deliberate indifference, a plaintiff must show that "(1) municipal policymakers know that employees will confront a particular situation; (2) the situation involves a difficult choice or a history of employees mishandling; and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." Carter, 181 F.3d at 357.  Here, it cannot be disputed that municipal policymakers knew that police officers could confront potentially dangerous situations where the suspect in question is unarmed.  Those situations, to be sure, involve a difficult choice and a history of employees mishandling them, as evidenced by the fifty-nine unarmed citizens shot by PPD officers between 2007 and 2013 and the ignorance of officers as to the appropriate standard for the use of deadly force.  DOJ Report at 27, 40.  Finally, the wrong choice by an officer in these situations frequently lead to the use of excessive force, which constitutes deprivation of an individual's Fourth Amendment rights.  See Graham v. Connor, 490 U.S. 386, 397 (1989) (holding that "[a]s in other Fourth Amendment contexts…the 'reasonableness' inquiring in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them.").

     Moreover, a reasonable jury could find that the need for improved training of PPD officers on the use of deadly force was "so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." City of Canton, 489 U.S. at 390.  The need for training on the use of deadly force is obvious, as the primary purpose of a police department is to ensure the safety of the citizens it serves.  Shooting unarmed citizens does not achieve this purpose.  Further, a reasonable jury could find that the inadequacy of the use of force training was so likely to result in the violation of constitutional rights that policymakers were deliberately

indifferent to the need for proper training. This finding can be supported by the high number of PPD officer shootings involving unarmed citizens, DOJ Report at 40, and the lack of adequate training for officers regarding the use of force, particularly deadly force. Id. at 40, 69-81.

A reasonable jury could also find that the City "was deliberately indifferent to the systemic deficiencies in the internal investigatory and disciplinary mechanism of the PPD and to the risk that these deficiencies would result in violations of citizens' rights." Lyons, No. 06-5195, 2007 WL 3018945 at *8. In Lyons, the Court found that a report concluding that the PPD's disciplinary system was "fundamentally ineffective, inadequate, and unpredictable," coupled with the officer's behavior demonstrating the inadequacy of that system, provided sufficient support for a Monell claim to survive summary judgment. Id. at *2. Here, we have a similar situation. The DOJ Report found that the City's internal disciplinary procedures were defective, specifically noting that the PBI worked to "essentially invalidate" the findings of the UFRB in a way that exonerated officers who were originally found to have violated PPD policy. DOJ Report at 109-112. Perone's experience with the internal disciplinary procedures perfectly matched the reality described in the DOJ Report, as he was found guilty of violating departmental policy by the UFRB but, on appeal, had this finding unanimously invalidated by the PBI. See UFRB Mem. to Police Commissioner at 1; see also PBI Report at 2. The PBI hearing and report were especially deficient. The hearing lasted only thirty minutes and only one witness testified. Michvech Dep. at 33: 2-5, 35: 3-8, 37: 1-14. Perone spoke at this hearing only when the PBI swore him in. Perone Dep. at 15: 15-18. Further, the PBI report claimed that an "aggressive prosecution" was presented and that plaintiff Coyett "failed to appear," at this hearing, when in reality the prosecution was far from aggressive and no one had bothered to inform Coyett of this hearing nor asked him to attend. See PBI Report at ¶¶ 2, 9; see also

Michvech Dep. at 31: 15-24, 32: 1-2. Like the Court in Lyon, we find that a report detailing the failings of the PPD's internal disciplinary process, paired with the procedural failures evident in Perone's disciplinary proceedings, suggests deliberate indifference.

Finally, the question of causation -- specifically, whether the City's custom of failing to provide adequate use of force training, or a suitable internal disciplinary process for its officers, was the "moving force" behind the Perone's shooting of Coyett -- is one best left for a jury resolution. Our Court of Appeals has been very clear on this issue, especially when the question of causation involves the use of force. See Bielevicz, 915 F.2d at 851. Thus, while we make no determination as to whether Perone's actions were caused by the City's customs, we recognize that a motion for summary judgment is not the proper vehicle for answering this question.

In sum, a reasonable jury could find that the City was deliberately indifferent to purported constitutional violations when it failed to properly train PPD officers in the use of deadly force. This finding can be based on evidence from the record which shows a custom among the PPD of not training officers, a pattern of unconstitutional behavior that satisfies legal standards laid out in Connick and Carter, and that the need for further training was so obvious that policymaker were deliberately indifferent to the rights of the City's citizens. It could also find that the City was deliberately indifferent when it continued to implement a flawed internal investigatory and disciplinary mechanism that resulted in the violations of citizens' rights. And, the question of causation between the City's customs and Perone's actions is one to be answered by a jury, not a judge. To be sure, we are not claiming that a potential jury will find the City of Philadelphia liable under Section 1983. But that is not the standard we apply when deciding a motion for summary judgment. The evidence of record necessitates that the City's motion be denied.

Police officers have an unenviable job, and everyday police work cannot be reduced to a series of policy statements, directives, or obtuse legal standards.  Police officers can find themselves in fast-paced, complex, and dangerous situations in the course of their duties, and performing these duties at a consistently high level, we imagine, is a daunting task.  And we are well aware that the Philadelphia Police Department is a large, complex organization that manages thousands of employees who are tasked with ensuring the safety of Philadelphia's 1.6 million residents.

But the difficulty of a police officer's job and complexity of the PPD do not excuse noncompliance with the Constitution and laws of the United States.  We by no means ask for perfection from the Philadelphia Police Department and its officers, but the citizens of Philadelphia deserve a Police Department that implements adequate officer training and accountability measures regarding the use of force, specifically the use of deadly force.

## V.     Conclusion

The City of Philadelphia has moved from summary judgment on plaintiff Samir Coyett's <u>Monell</u> claim, and we will deny the City's motion as the evidence of record could lead a reasonable jury to impose municipal liability on the City pursuant to Section 1983.  An appropriate Order follows.

BY THE COURT:

  /s/Stewart Dalzell, J.
Stewart Dalzell, J.